

Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, PA  19103
☎ 215.299.2000  🖶 215.299.2150
www.foxrothschild.com

BRIAN J. MCGINNIS
Direct No: 215.299.2042
Email: bmcginnis@foxrothschild.com

July 7, 2026

**VIA ECF**
Honorable John F. Murphy
United States District Judge
United States District Court for the
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

**Re:    Green v. Sugarhouse HSP Gaming LP d/b/a Rivers Casino Philadelphia**
**Civil No. 2:25-cv-02193-JFM; Notice of Supplemental Binding Authority**

Dear Judge Murphy:

This firm continues to represent Defendant Sugarhouse HSP Gaming LP d/b/a Rivers Casino Philadelphia ("Rivers") in the above-referenced case. As the Court is aware, on June 16, 2026, Rivers filed its Motion for Summary Judgment, ECF No. 31. On June 30, 2026, Plaintiff Robert Green ("Green") filed his Opposition, ECF No. 32. On July 6, 2026, Rivers filed its reply brief in further support of the motion, ECF No. 33. On July 6, 2026, the United States Court of Appeals for the Third Circuit issued a precedential opinion in *Lynn v. Bank of New York Mellon*, No. 25-1664. A true and correct copy of this opinion is submitted herewith.

I write to draw the Court's attention to the Third Circuit's opinion in *Lynn*, about which the undersigned first learned today (*i.e.*, after Rivers' reply brief was filed). In *Lynn*, the Third Circuit affirmed the district court's grant of summary judgment to the employer. While *Lynn* involved federal and state employment statutes that are not at issue in the instant case, the Third Circuit's opinion is nevertheless relevant in two respects.

*First*, in affirming summary judgment, the Third Circuit considered the role of various statements offered by the employee to show a genuine dispute of material fact sufficient to defeat summary judgment. The Third Circuit noted that the employee offered statements that were "essentially conclusory and lacking in specific facts." (Op. at 11–12 (citing *Blair v. Scott Specialty*

A Pennsylvania Limited Liability Partnership

California    Colorado    Delaware    District of Columbia    Florida    Georgia    Illinois    Massachusetts    Minnesota    Missouri
Nevada    New Jersey    New York    North Carolina    Oklahoma    Pennsylvania    South Carolina    Texas    Washington
187234376.1



July 7, 2026
Page 2


*Gases*, 283 F.3d 595, 608 (3d Cir. 2002).) Specifically, the employee offered "opinions [and] conclusions" about what he believed the alleged decisionmaker meant by various statements but provided no "specific facts" to ground those beliefs in the undisputed material fact record. (*Id.*). Notably, the employee "could not even say whether" or when a decisive conversation regarding his claims allegedly took place. (Op. at 12.) Because "no facts in the record independently" supported the employee's conclusory statements and arguments, the Third Circuit found he had failed to show a genuine material fact dispute and affirmed summary judgment. This holding is applicable in the instant case, where Green offers only conjecture, speculation, and "conclusory, self-serving" statements in his Opposition and in his responses to Rivers' statements of material fact. (Op. at 12.) *See generally*, ECF Nos. 31, 33.

*Second*, the Third Circuit clarified that, in claims involving pretext analysis under the *McDonnell Douglas* framework, an employee "must present evidence at the pretext stage that would convince the factfinder **both** that the employer's proffered explanation was false, **and** that [discrimination or] retaliation was the real reason for the adverse employment action." (Op. at 16) (internal quotation and citation omitted) (emphasis supplied). This holding is also relevant in the instant case as to Green's claims for discrimination and retaliation to which the *McDonnell Douglas* framework applies. In this case, Green has failed to show any genuinely disputed material fact that Rivers' stated reason for terminating his employment (*i.e.*, insufficient attendance credits due to his failure to promptly report FMLA absences to MetLife) was **both** false **and** that the true reason for the termination was discriminatory and/or retaliatory motive. Thus here, as in *Lynn*, Green's inability to do so is dispositive.

Rivers appreciates the Court's consideration of this matter.


Respectfully submitted,

*/s/ Brian J. McGinnis*
Brian J. McGinnis

BJM
Encl.
cc:      All counsel of record (*via ECF*)


187234376.1

# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-1664

ROBERT LYNN,
Appellant

v.

THE BANK OF NEW YORK MELLON; THE BANK OF NEW YORK MELLON CORP.

_____

Appeal from the U.S. District Court, D.N.J.
Judge Evelyn Padin, No. 2:22-cv-4655

Before: PORTER, MONTGOMERY-REEVES, and BOVE, *Circuit Judges*

Submitted Apr. 10, 2026; Decided Jul. 6, 2026

_____

OPINION OF THE COURT

PORTER, *Circuit Judge*.

Robert Lynn sued Bank of New York Mellon,[1] alleging that his demotion and termination were racially discriminatory

_____

[1]    Defendants in this action are The Bank of New York Mellon and The Bank of New York Mellon Corporation (together, "BNY").

and retaliatory. The District Court granted BNY's motion for summary judgment, and Lynn appeals. We will affirm.

I

Lynn, a black man, was employed at BNY from April 2019 to September 2021. Between August 2019 and April 2021, Lynn served as a portfolio manager, responsible for the budget and program performance of the Asset Servicing Technology ("AST") division. During that time, he reported to London-based Daniel Shawe, a white man and Chief Operating Officer for the AST division. Initially, Lynn enjoyed working for Shawe, who gave Lynn positive performance reviews and generous bonuses. According to Lynn, Shawe never said anything negative about black people in the course of their history together.

In August 2020—in the wake of Black Lives Matter ("BLM") protests—Shawe was responsible for arranging "courageous conversations" within his division aimed at "supporting diversity." Appendix ("App.") at 438. In preparation for one such conversation, Shawe told Lynn he "does not believe in Black Lives Matter [or] in the concept of white privilege." *Id.* at 438–39. He said he was a "capitalist, and a banker" who "does not support the deconstruction of our system." *Id.* at 439. He further stated "screw [] '[d]efund the police.'" *Id.* Lynn took Shawe's comment to mean he did not support the BLM movement, not that he believed black lives don't matter. Shawe then encouraged Lynn to speak freely about his differing views and personal experiences, which would add value to the courageous conversations.

In January 2021, Shawe told Lynn that he should gain

2

more "vertical" experience in another M-level Director role, which all had the same pay and benefits as his current role. The parties dispute whether Lynn had a meaningful choice over leaving his current role. Either way, Shawe helped Lynn identify open positions, and Lynn was attracted to an M-level project manager role that he "wanted to apply for, because it perfectly matched" his experience. App. at 479. With Shawe's help, Lynn interviewed for the position and was "actively engaged in trying to secure th[e] position." App. at 1389. Laura Rogers—COO of the Architecture and Data division—offered Lynn that job over a white female applicant, and he accepted. Although Lynn's old role ceased to exist after he left, Shawe told him that if things didn't work out in his new role, Lynn could come back to Shawe's team for three to six months until they found him another role with the company.

Lynn's relationship with BNY deteriorated. In April 2021, before fully transitioning to Rogers's team, Lynn was assisting his colleagues in preparing a slide deck for a presentation to firm executives. A few hours before the presentation, Lynn unilaterally inserted a footnote accusing the AST division of being "an unsafe environment for black employees to advance and to expand their managerial skills" and describing Shawe's doubts about the BLM movement from eight months earlier. App. at 1566. Lynn never reported his concerns to human resources; rather, one of Lynn's colleagues noticed the footnote and told Shawe, who reported it to human resources. BNY promptly investigated and found Lynn's claims to be unsubstantiated.

When Lynn joined Rogers's team, several of his colleagues reported that he demonstrated performance issues, lack of technical skill, aggressive behavior, and an

3

unwillingness to learn. Rogers tried to instruct Lynn on steps he could take to improve, but to little avail. Lynn began searching for another role, and he heard that the data taxonomy team was considering creating a new role that he thought would match his skills and interests. BNY usually requires an employee to hold a position for one year before shifting roles, but Rogers waived that requirement so Lynn could apply. Lynn interviewed with several members of the data taxonomy team, but the team leader decided not to hire him nor to create the new position because Lynn lacked the technical skill necessary to succeed in the role. On June 17, 2021, a day after being notified of that decision, he filed a charge of discrimination with the EEOC and emailed Rogers and HR representatives with a copy of the complaint.

Meanwhile, Lynn continued to demonstrate poor performance. On August 17, 2021, Rogers placed Lynn onto a performance improvement plan ("PIP"), which included feedback on what he could improve. Two days later, Lynn responded with a lengthy refutation of Rogers's feedback and further stated, "I believe that I am continuing to be discriminated against on the basis of my race and retaliated against because of my race-discrimination complaints, including my filing of an EEOC Charge against BNYM." App. at 1738.

At the end of the month, Rogers attended a senior leadership meeting where a pending merger between her team and another was discussed. According to Rogers, this meeting led her to conclude that the reorganization would create some redundancy between roles and that one of her four M-level directors needed to go. She settled on Lynn's position because he was the poorest performing of her directors. On September

4

1, 2021, Rogers and representatives from human relations and corporate counsel decided to eliminate Lynn's position. On September 9, 2021, Rogers and Jeanne Mason informed Lynn that his position was being eliminated as a result of the reorganization. BNY did not replace him.

In July 2022, Lynn filed suit against BNY alleging race discrimination, retaliation, and hostile work environment in violation of Title VII, Section 1981, and the New Jersey Law Against Discrimination ("NJLAD"). The District Court granted BNY's motion for summary judgment on all claims. Lynn timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. "We review [a] grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 304 (3d Cir. 2020) (internal citation and quotation marks omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). And a factual dispute is "material" if it might affect the outcome under governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011). A court's task is not to resolve disputes, but to determine whether there are factual disputes to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III

We analyze each of Lynn's discrimination and retaliation claims under the burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Abramson v. William Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001) (Title VII and NJLAD); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (Title VII and § 1981). We do not apply this framework to his hostile-work environment claims. *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017). Our substantive analysis for each claim is identical, whether under Title VII, Section 1981, or the NJLAD. *See, e.g.*, *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498–99 (3d Cir. 1999).

A

To make out a prima facie case of race discrimination, Lynn must show (1) "that he is a member of a protected class," (2) "that he is qualified for the position," and (3) that he suffered an adverse employment action (4) "under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." *Jones*, 198 F.3d at 410–11. Lynn claims race discrimination based on his alleged demotion from Shawe's team as well as the eventual termination of his employment.

1

The District Court held that Lynn established a prima

6

facie case that his termination was racially discriminatory but that he failed to demonstrate that BNY's proposed non-discriminatory reasons for firing him were pretextual. We disagree with the District Court that Lynn made out a prima facie case that his termination was racially discriminatory.[2] As the District Court noted, it is undisputed that Lynn, a black man, belongs to a protected class, that the termination of his employment constitutes an adverse employment action, and that he was qualified for his position as a project manager with the Architecture and Data division. Lynn argued, and the District Court agreed, that a single fact gave rise to an inference of discrimination: that Lynn was "replaced" by a white man— Michael Maresca. But that fact alone does not raise an inference of discrimination.

To start, it is not accurate to say that Rogers hired a white man to replace Lynn; it is undisputed that Lynn's position was eliminated and nobody was hired to replace him. Rather, his responsibilities were spread to existing employees, including Maresca.[3] What's more, just as being replaced by someone outside the plaintiff's protected class is not necessary to raise an inference of discriminatory animus, it is also not sufficient on its own to do so. *See Pivirotto v. Innovative Sys.,*

---

[2]    We "may affirm on any basis supported by the record." *Davis v. Wells Fargo*, 824 F.3d 333, 350 (3d Cir. 2016).

[3]    The dispute of material fact is over the extent to which Maresca took over Lynn's responsibilities. Maresca, for example, says that "you couldn't say I took Rob's role over. I mean, it would have to be a combination of me and Jeff [Silver]." App. at 1429. But it is undisputed that Lynn's role was eliminated.

7

*Inc.*, 191 F.3d 344, 347, 354 n.6 (3d Cir. 1999) ("While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.'") (quoting *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 & n.7 (5th Cir. 1997)); *see also Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989) ("The sex of [plaintiff's] replacement, although a relevant consideration, is not necessarily a determinative factor in answer to either the initial inquiry of whether she established a prima facie case or the ultimate inquiry of whether she was the victim of discrimination.").

Lynn also fails to present evidence explaining why Rogers, the same person who *hired* him just a few months earlier, was racially motivated in firing him so soon after. Indeed, when "the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring," that is strong evidence that "discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991); *see also Waldron v. SL Indus.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995) (rejecting the *Proud* court's creation of an inference, but acknowledging that such evidence can weigh in favor of summary judgment); *Brown v. CSC Logic Inc.*, 82 F.3d 651, 658 (5th Cir. 1996); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174–75 (8th Cir. 1992). "[I]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Proud*, 945 F.2d at 797 (citation omitted). Especially so here, where Rogers hired Lynn over a white woman. Without more, no rational jury could find under these circumstances that Rogers was

motivated by racial animus in eliminating Lynn's position.[4]

2

Lynn also claims he suffered unlawful racial discrimination when Shawe "demoted" him from his portfolio manager position in the AST division and "forced" him to take the program manager position with Rogers. Appellant's Br. at 50. The District Court rejected this claim at the prima facie stage because Lynn voluntarily left his position with Shawe. We agree.

The District Court analyzed Lynn's claim as one for "constructive demotion" and asked whether Lynn's demotion was "truly voluntary." Dist. Ct. Op. at 27–28, App. at 29–30. *See, e.g.*, *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003) (adopting constructive demotion claims as an offshoot of constructive discharge). We have not recognized constructive demotion as a viable claim in our circuit. But even assuming its viability, Lynn has not adduced evidence that would allow a reasonable jury to find that Shawe "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled" to take the job with Rogers. *Colwell v. Rite Aid. Corp.*, 602 F.3d 495, 502 (3d Cir. 2010).

Lynn enjoyed working for Shawe, who he said was

---

[4]    True, "evidence supporting the *prima facie* case is often helpful in the pretext stage," and vice versa. *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 370 (3d Cir. 2008). But none of Lynn's pretext evidence demonstrates racial animus at the prima facie stage; though, as discussed later, it may help to establish a prima facie case of retaliation.

"supportive of not just me, but the whole team." App. at 410–11. Shawe never took disciplinary action against Lynn. Rather, Shawe gave Lynn positive performance reviews and generous bonuses. Shawe even went out of his way to help Lynn identify another position he desired. Shawe, who is white, never said anything negative about black people. The only fact Lynn points to is his disapproval of Shawe's political opinions about the BLM movement. But as Lynn himself admits, Shawe was voicing his scruples about the BLM political movement, not that he thought black people's lives don't matter. Indeed, Lynn testified that, in the same conversation, Shawe told him to be vocal about his differing political views and his personal experiences with racial prejudice, which would "bring value to the 'courageous conversation[s]' " that the company was encouraging. App. at 445. The record simply does not reflect that Lynn faced unpleasant or difficult working conditions while on Shawe's team.[5]

Nor could a rational jury find that Lynn felt compelled to leave Shawe's team. By Shawe's account, he met with Lynn to offer "professional guidance [that] if he wanted to continue to develop and grow, the best thing he could do was to pick up an enterprise program role." App. at 1069. Lynn "picked a role that he desperately wanted" and, with Shawe's recommendation to Rogers, was offered the job. App. at 1070–72. Lynn's account is similar. By his admission, he believed the project manager position in Rogers's division "perfectly

---

[5]    Lynn also points to the fact that Shawe replaced him with a less qualified white employee, Terri Moag. That development, which occurred after he voluntarily left Shawe's team, says nothing of Lynn's working conditions *before* he left.

10

matched" his experience. App. at 479. Lynn asked Shawe to help get him an interview, which Shawe did. Lynn interviewed for and was offered the position, which he accepted. Nonetheless, Lynn now claims he felt he "had no choice [but] to leave his Portfolio Lead position" because Shawe "directed him" to apply for other M-level director roles.[6] Appellant's Br. at 50–53. But contrary to Lynn's assertion, Shawe never "told Lynn he would be terminated if he did not find a Program Manager role within three to six months." Appellant's Br. at 51. Rather, it was *after* Lynn accepted the new role and transitioned to it that Shawe told him he could come back to Shawe's team for three to six months if the new position did not work out.

Lynn argues this last material fact is disputed based on his declaration, in which he asserted:

> At some point after Mr. Shawe told me I could no longer continue in my Portfolio Lead position, he told me that I had three (3) to six (6) months to find a new role as Program Manager. I understood this to mean that I would be terminated if I did not find a Program Manager role within that time.

App. at 1501. But "[a]n affidavit that is essentially conclusory

---

[6]    That Lynn's new role was at the same level, pay, and benefits as his old role, does not necessarily mean his alleged "demotion" wasn't an adverse employment action. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024). Rather, Lynn need "show only some injury respecting [his] employment terms or conditions." *Id.*

11

and lacking in specific facts is inadequate to satisfy the movant or non-movant's burden." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (citation modified). Lynn's affidavit focuses on "opinions [and] conclusions" about what he understood Shawe to have meant but it lacks "specific facts." *Id.* Indeed, he could not even say whether this conversation occurred before or after he transitioned to Rogers's team, let alone offer an approximate date for it. Lynn's conclusory, self-serving declaration is insufficient to defeat summary judgment. No facts in the record independently cast doubt on Shawe's detailed account that the conversation occurred *after* Lynn had already started with Rogers. There is no evidence suggesting Shawe ever threatened Lynn with termination of his employment if he did not leave on his own.

B

Lynn claims there is sufficient evidence for a rational jury to find that the termination of his employment was retaliation for his complaints of race discrimination.[7] The District Court found that Lynn met his burden of making out a prima facie case that his termination was retaliatory but that he failed to demonstrate that BNY's proposed nonretaliatory reasons for Lynn's termination were pretextual. We agree.

---

[7]    On appeal, Lynn forfeits his retaliation claims based on his alleged demotion, his rejection by the data taxonomy group, and his placement on a PIP.

12

1

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the [retaliatory] adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Lynn proposes as protected activity his email response to Rogers's PIP, which came two days after the PIP and less than three months after his EEOC charge. In his email to Rogers, he stated, "I believe that I am continuing to be discriminated against on the basis of my race and retaliated against because of my race-discrimination complaints, including my filing of an EEOC Charge against BNYM." App. at 1738. The District Court found, and the parties don't dispute, that this was protected activity.[8] And Lynn's termination

---

[8]    An employee engages in protected activity when he "opposes, or participates in a proceeding against, the employer's activity," but the employee must "hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

The District Court held that Lynn's August 19 email was protected activity because, in it, Lynn "point[ed] to specific disagreements he had with some of [Lynn's] performance feedback" in the PIP. App. at 36. This is not sufficient; Lynn must have reasonably believed that his

13

naturally constituted an adverse employment action. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

As to the third element—causation—"a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *see also LeBoon v. Lancaster Jewish Cmty. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Otherwise, "we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference." *LeBoon*, 503 F.3d at 232. The District Court found that Lynn met his burden to show a prima facie case of causation based solely on the temporal proximity between his protected activity on August 19 and BNY's termination decision on September 1.[9] We agree

placement onto the PIP *violated Title VII*, not just that the performance feedback was wrong.

Rather, because his EEOC charge was filed less than three months earlier, and Rogers had knowledge of that charge, there is at least a reasonable inference to be raised that the PIP was retaliation for the EEOC charge. Thus, Lynn's statement in his August 19 email that he believed he was continuing to be retaliated against constitutes prima facie protected activity.

[9]   The District Court said the termination decision occurred on August 31, 2021. But the record suggests that Rogers and others made the final decision to terminate Lynn's position on September 1. Further, the Court treated the internal termination decision as the adverse action. But under our case law, "adverse employment action occurs . . . at the time the employee receives notice of that action," not when the decision

14

that under these circumstances a thirteen-day window between protected activity and adverse action is temporally sufficient to raise a prima facie inference of causation. *See Shellenberger v. Summit Bancorp*, 318 F.3d 183, 189 (3d Cir. 2003) (ten days); *see also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (twelve days).

2

To satisfy its "relatively light" burden to articulate a legitimate reason for its termination decision, BNY points to the August 31, 2021 meeting regarding the impending reorganization. *Fuentes v. Perksie*, 32 F.3d 759, 763 (3d Cir. 1994). This meeting, it contends, led Rogers to conclude that her team was top-heavy and that she needed to eliminate an M-level position. She chose Lynn, the lowest performing of her four M-level directors. The reorganization and Lynn's unsatisfactory job performance each constitute legitimate reasons for termination. *See Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) ("demonstrably poor job performance"); *Jackson v. U.S. Steel Corp.*, 624 F.2d 436, 443 (3d Cir. 1980)

---

was made internally. *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 852–53 (3d Cir. 2000). Here, BNY sent Lynn the termination notice on September 9. In any event, the proximity between the adverse action and the internal termination decision can still be evidence of retaliatory motive. *See, e.g.*, *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 305 (3d Cir. 2007) ("[T]he jury could reasonably infer from this evidence that PHA resolved to terminate Marra by no later than November 2001, only five months after [the protected activity] rather than several months later when the adverse employment decision was formally carried out.").

15

("legitimate business reorganization").

3

Thus, we turn to the third step of the *McDonnell Douglas* framework—Lynn must adduce evidence creating a genuine dispute of material fact whether BNY's proffered non-discriminatory reason for firing him is pretextual. *Ross*, 755 F.3d at 193. Because "the burden for establishing causation at the prima facie stage is less onerous" than at the pretext stage, *Foster v. Univ. of Maryland- E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015), the employer's "legitimate reason to take an adverse employment action dispels an inference of retaliation based on temporal proximity" alone. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). So Lynn must present evidence at the pretext stage that would "convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342.[10]

---

[10]    Our case law is unclear about whether these pretext requirements are conjunctive or disjunctive. *Compare Fuentes v. Perksie*, 32 F.3d 759, 764 (3d Cir. 1994) ("[T]he plaintiff must convince the factfinder *both* that the reason was false, *and* that discrimination was the real reason.") (quotations omitted) (emphasis in original), *and Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) ("[P]laintiff [must] demonstrate that the employer's proffered explanation was false, *and* that retaliation was the real reason for the adverse employment action.") (quotations omitted) (emphasis added), *with Fuentes*, 32 F.3d at 764 ("[T]he plaintiff must point to some evidence, direct or circumstantial, from which a

In other words, Lynn must present enough evidence that would permit a reasonable juror to find that retaliation "was a *determinative factor* of the employment decision, meaning that [he] would not have been terminated but for [his] protected activity." *LeBoon*, 503 F.3d at 232 n.8 (emphasis in original). He cannot do so.

Aside from temporal proximity, Lynn's weak and

factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.") (emphasis added), *and Canada*, 49 F.4th at 347 ("[T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate reasons; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.") (quotations omitted) (emphasis added).

The Supreme Court has held that "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." 509 U.S. 502, 515 (1993) (quotations omitted) (emphasis in original). The Court affirmed that general rule in *Reeves v. Sanderson Plumbing Products*, but it also clarified that, under certain circumstances, "the proof that the employer's explanation is false" may be so "probative" as to itself also allow an inference of intentional discrimination. 530 U.S. 133, 149 (2000). Thus, although both elements are still formally required, proof that the employee's explanation is false may be so strong as to also permit an inference of discrimination. *Id.* at 148.

17

mischaracterized evidence of BNY's retaliatory motive does not make out a genuine dispute of material fact. He cites Rogers's consistent feedback about his poor performance as evidence of a "pattern of antagonism." *DeFlaminis*, 480 F.3d at 267. But again, Lynn's poor performance is a legitimate, non-discriminatory reason for his termination. To establish pretext under such circumstances, Lynn must point to evidence suggesting that his performance criticism fits within a broader pattern of antagonism that raises an inference of retaliatory animus. *See Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993) (finding the record evidence supported a pattern of antagonism where, in addition to a "constant barrage of written and verbal warnings," plaintiff's supervisors "began a pattern of harassing Robinson by repeatedly disciplining him for minor matters, miscalculating his points for absences from work, and generally trying to provoke Robinson to insubordination"); *cf. McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) ("[N]ot every critical comment—or series of comments—made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights.").

Lynn points to no such evidence. Unlike the plaintiff's supervisors in *Robinson*, Rogers demonstrated a desire to work with Lynn to improve his performance, which is far from antagonistic. Further, Rogers's criticisms of Lynn's performance were all based on negative feedback she received from multiple employees, including those who had never heard about the slide deck presentation or the EEOC charge. Lynn now suggests that Rogers's retaliatory motive is evidenced by her critiques of his slide deck complaint. But Rogers's feedback about that complaint explicitly focused on *the*

18

*manner* in which Lynn complained, not that he did so.[11] In fact, she expressed concern for the substance of his allegation by observing that the unprofessional manner in which he raised the issue could have prevented review of his complaint, which

---

[11]    In Rogers's feedback meeting with Lynn, she said:

> I am aware that Human Resources has concluded its review of the allegations you raised and has closed that matter with you. Today, I want to discuss a different issue—the footnote you inserted into the [presentation]. . . . The Company takes these types of concerns very seriously, however, raising them in the manner that you have is inconsistent and in contravention of our policies and procedures. BNY Mellon encourages its employees to raise concerns by the various available channels as detailed in the [Employee Handbook] . . . . Your decision to slip your personal concern into an unrelated presentation about data strategy . . . shows poor judgment for a senior leader at the Company. It also could have prevented your concern from being reviewed and addressed given that it was not submitted through the available and appropriate complaint channels. . . . As your manager, I consider it a breach of trust that you took the approach we discussed instead of following a policy to raise a concern. . . . You are a valued employee and it is expected that such a lapse of judgment will not be repeated.

App. at 1695–96.

19

the "[c]ompany takes . . . very seriously." App. at 1695.

Lacking evidence of a pattern of antagonism, Lynn is left with little more than Rogers's allowance that his complaints "frustrated" her. App. at 820, 884. But Lynn takes these statements out of context. Rogers makes clear that she "wasn't angry" at Lynn and that her frustration came from the fact that they had been "working [together] on an exciting opportunity" and that "it's not how I perceived the events." App. at 821, 885. In any event, she then said she "liked working with Mr. Lynn" and wanted to "keep working with" Lynn "in good faith" after he filed the EEOC charge. App. at 821, 885. Read in context, as a rational juror would, Rogers's use of the word "frustrated" in no way establishes a retaliatory motive, especially not one that was the determinative factor in Lynn's firing decision.

Having concluded that Lynn failed to adduce evidence that would permit a rational jury to infer retaliatory motive by BNY's decisionmakers, we need not consider whether Lynn presented sufficient evidence to establish that the claimed reorganization was fabricated.[12] We will therefore affirm the District Court's summary judgment as to his retaliation claim.

---

[12]    The record suggests otherwise. The reorganization had been planned since April 2021. Maresca and Rogers both testified that Lynn's position was no longer needed after the reorganization because the team was overstaffed. And it is undisputed that several of his colleagues—including ones who knew nothing about his protected activity—had reported that Lynn was struggling to meet expectations.

20

C

Lynn claims he was subjected to a hostile work environment "because of his race and protected activity." Appellant's Br. at 55. "[O]ur usual discriminatory hostile work environment framework applies equally to claims of retaliatory hostile work environment." *Komis v. Sec'y of the U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019) (citation modified). Lynn must prove "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Id.* (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).

Lynn claims he "presented significant evidence demonstrating that he suffered intentional discrimination," and that the record "demonstrates the totality of discriminatory and retaliatory harassment to which [BNY] subjected Lynn." Appellant's Br. at 55–56. That's all he says on the matter. Lynn does not meaningfully contend with the five elements outlined above. Thus, he has forfeited his hostile work environment claim. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("It is [] well settled, however, that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.").[13]

---

[13]    We will also affirm the District Court's summary judgment on Lynn's punitive damages claim. To state a claim for punitive damages in the employment discrimination context, the plaintiff must demonstrate that an employer acted with "malice" or "reckless indifference" to his federally

21

*    *    *

For the reasons above, we will affirm the District Court's order.

Lane J. Schiff
CONSOLE MATTIACCI LLC
 *Counsel for Appellant*

Christopher Bouriat
Corinne M. Mishkin
M. Patrick Yingling
REED SMITH LLP
 *Counsel for Appellees*

---

protected rights. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Because no rational jury could find that BNY violated any of Lynn's federally protected rights, no jury could not find a malicious or recklessly indifferent violation.

22